UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

WILLIAM C. SWARTZ,                    ]
                                      ]
        Plaintiff(s),                 ]
                                      ]
    vs.                               ]        CV 97-N-1368-W
                                      ]
GULF STATES PAPER                     ]
CORPORATION,                          ]
                                      ]
        Defendant(s).                 ]

**Memorandum of Opinion**

## I.    Introduction.

The plaintiff, William C. Swartz ("Swartz"), brings this action pursuant to the

Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102, *et seq.* Specifically, the plaintiff

alleges the defendant, Gulf States Paper Corporation ("GSPC"), failed to reasonably

accommodate him and created a hostile work environment, both in violation of the ADA.

This action is before the Court on defendant's motion for summary judgment filed

December 11, 1997.   The motion has been briefed by the parties and is ripe for decision.

Upon due consideration, defendant's motion for summary judgment will be granted.

## II.   Statement of Facts.[1]

GSPC's primary business is the manufacture and sale of a variety of paper products.

Log Industries, which is owned by GSPC, operates a mill that processes raw logs into

---

[1] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

lumber used for general construction and which, until early 1997, was located on Jug Factory Road in Tuscaloosa, Alabama.  In May 1997, Log Industries opened a new mill in Moundville, Alabama, and ceased operations at the Jug Factory Road mill.  At the former mill, raw logs were processed by transporting them via a large conveyor through the saw mill where a series of industrial saws cut the logs into rough lumber, which subsequently was processed into finished boards.  The initial cutting operation was controlled by a person called the "sawyer" who operated cutting machinery  from an elevated control booth (or cab) where, while seated in a chair and with the assistance of a video monitor, he guided the logs through the saw by the operation of joystick controls and foot pedals. *Plaintiff's Deposition*, at 10-15, 18-22.

Plaintiff Swartz was initially employed by Log Industries as a sawyer in March 1979. On June 8, 1994, while attempting to lift a loose log onto the saw carriage, plaintiff ruptured a biceps tendon, which was surgically repaired on June 23, 1994.  After an extended period of rehabilitation and light-duty work, plaintiff was released for full duty on August 15, 1994, with the sole restriction that he work no more than an eight (8) hour day or a forty (40) hour week.  Plaintiff continued to complain of pain and a series of follow-up visits and tests revealed that he had cervical spondylosis, a form of osteoarthritis,[2] in the neck, back and shoulder areas.

---

[2]Cervical spondylosis is a disorder that results from abnormal growth of the bones and neck (cervical vertebrae) and degeneration and mineral deposits in the cushions between the vertebrae (cervical disks).  *See Orbis Broadcast Group* (visited March 20, 1998) <http://housecall.orbisnews.com/databases/ami/convert/000436.html>.

The plaintiff was released at maximum medical improvement (MMI) on November 18, 1994, with an impairment rating of twelve percent (12%) in his upper left extremity. On February 8, 1995, plaintiff reported pain in both wrists and was subsequently diagnosed with carpal tunnel syndrome. Surgery was performed and on March 15, 1995, plaintiff reached maximum medical improvement with an impairment rating of four percent (4%) in each of his left and right upper extremities.

Tim Tucker, GSPC's human resources director, was aware of the plaintiff's disability ratings, but understood them to be relevant to temporary restrictions only. *See Tucker Deposition*, at 90. Tucker testified that no specific, physical analysis of the sawyer's job has been performed to determine what essential functions or requirements were relevant under the ADA.

On August 17, 1995, while attempting to remove a log that had become wedged between the outfeed tunnel and a rolling mechanism, plaintiff reported a burning sensation in his left arm. Given the accumulation of injuries plaintiff had experienced in the past while trying to lift heavy objects, his supervisors warned him not to engage in such conduct and not to exceed his restrictions. Plaintiff was subsequently diagnosed with a herniated cervical disk (*i.e.*, in his neck).

On September 1, 1995, surgery was performed to repair the herniation and to fuse plaintiff's cervical spine. Follow-up visits established that plaintiff had degenerative cervical disk disease. On October 16, 1995, plaintiff was released for regular duty with the 40 hours per week limitation remaining as his only restriction. The September 1995 spinal

3

fusion did not heal properly and plaintiff's cervical spine required a re-fusion,[3] which took place on October 30, 1995.

Following the re-fusion, plaintiff was placed on light duty[4] on December 28, 1995, with restrictions on repetitive neck movements, lifting, and stooping. These restrictions were removed on February 28, 1996, with the only remaining restriction from plaintiff's treating physician, Dr. Givhan, being that plaintiff should not work more than 40 hours per week. Plaintiff was later evaluated by Dr. James T. Barnett, Jr., to determine the extent of any permanent impairment for workers' compensation purposes. Dr. Barnett concluded that, as a result of his spinal fusion and subsequent re-fusion, plaintiff had a sixteen percent (16%) permanent physical impairment rating.

Thereafter, on May 16, 1996, plaintiff returned to Dr. Givhan seeking a permanent disability rating. *See Exhibit 11 to Affidavit of Tim Tucker.* Dr. Givhan informed plaintiff that, based on his physical capabilities, there was no possibility that he would receive a permanent total disability rating. *Id.* Plaintiff expressed to Dr. Givhan his concern about

---

[3]The plaintiff expressed the opinion that the fusion "broke loose" from his repetitive neck movement, but the plaintiff does not specify precisely where or when such repetitive neck movement took place. *See Plaintiff's Deposition,* at 60.

[4]GSPC has no written policy regarding "light duty" or temporary restricitons. *See Tim Tucker Deposition,* at 62. Tim Tucker, GSPC's human resources director, is responsible for supervising the return to work of employees with temporary restrictions and is responsible for the supervision and coordination of the provision of accommodations for persons with disabilities or permanent restrictions. *Id.,* at 63-71. Tucker testified that GSPC would "attempt to bring anybody back to light duty provided that their doctor would allow them to work, and it wasn't going to cause further injury to them and be safe for them to do that type job." *Id.,* at 67.

Tucker does not know, to a legal certainty, what GSPC's responsibilities under the ADA were to employees. However, his "assumption" was that the plaintiff did not have a disability because his injuries were temporary. *See Deposition of Tim Tucker,* at 82.

4

his ability to work as a sawyer[5] and Dr. Givhan explained to the plaintiff that, although he may experience some general pain, there was no medical reason why he could not perform his job as a sawyer. *Id.* In his notes of May 16, 1996, Dr. Givhan indicated that plaintiff displayed a poor attitude toward improvement. *Id.*

Apparently based on the plaintiff's description of his duties as a sawyer, Dr. Givhan returned the plaintiff to full duty on August 12, 1996, with a restriction on repetitive motion of his head and neck and continued limitation to a 40-hour work week. *Exhibit 12 to Tim Tucker Affidavit.* In addition, Dr. Givhan recommended, again based solely on plaintiff's description of the sawyer job, if possible, that plaintiff should perform a different job at GSPC.[6] *See Exhibit 12 to Tim Tucker Affidavit.* Mr. Tucker, human resources director, contacted Dr. Givhan shortly after receiving the recommendation and asked for clarification as to Givhan's clinic notes. *Tucker Deposition*, at 123-24.

Based upon Dr. Givhan's recommendation that plaintiff avoid repetitive neck movements, GSPC modified the chair in the sawyer cab so that it would swivel, thereby

---

[5] The plaintiff described the sawyer's job as requiring him to turn his head from right to left to see lumber coming off or judging the gates. *Plaintiff's Deposition*, at 11.

[6] Dr. Givhan's August 9, 1996, letter to Mr. Tucker read, in pertinent part, as follows:

This is my latest clinic note on William Swartz. I wish I could tell you and it would be my final clinic on Mr. Swartz but, as I am sure you are aware, I doubt this will be the case. At any rate, he is rather adamant about not being able to return to his job as a sawman. I do think that repetitive neck motions certainly exacerbate his problems and if there is another job that he can perform that does not require this activity, it would certainly be in his best interest.

*Plaintiff's Exhibit 4* (Tucker Deposition).

minimizing the required head movement.  In addition, GSPC provided rest breaks for the plaintiff virtually anytime that he required them.[7]

When the plaintiff returned to work on August 12, 1996, Andy Hinson, the acting mill manager, asked the plaintiff to operate the switches on the descrambler machine.  After two days, plaintiff informed his immediate supervisor, Bobby Conley, that he was unable to perform the descrambler job.  Plaintiff requested and was allowed to return to his job as a sawyer, which he performed without incident for several days.

Because of the contradiction between the plaintiff's request to Dr. Givhan for a permanent and total disability rating and GSPC's observations of plaintiff performing the sawyer job without apparent difficulty, as well as uncertainty as to whether the sawyer job fell outside of the plaintiff's physical restrictions, GSPC decided to videotape plaintiff engaging in his normal job activities and to submit the tape to Dr. Givhan for review and comment.

---

[7]The plaintiff testified in deposition that "[a]fter both surgeries, realizing that I couldn't function as properly as I should, Mr. Tucker and Connelly and Henson agreed to give me longer breaks." *Plaintiff's Deposition*, at 34.  When asked whether the defendant "set any time limit on [plaintiff's] breaks," the plaintiff responded that "I knew that if I was hurting, they would assist me at that point." *Id.*  The plaintiff also testified that, "They were willing to cooperate with me.  If I got to hurting, I could ask for a break and sometimes I would get one, and, sometimes, if the other people were busy, I didn't get one." *Id.* at 32.

The plaintiff initially agreed to be videotaped but when the videographer arrived on August 22, 1996, plaintiff refused to cooperate.[8]  GSPC instead videotaped another sawyer who performs the exact same duties as the plaintiff.

On August 26, 1996, the plaintiff arrived at work and informed GSPC that his attorney had advised him not to work as a sawyer anymore.  GSPC had no alternative jobs available at that time, but allowed the plaintiff to operate the merchandiser machine during that week, to fill in for an employee who was on vacation.[9]

---

[8]The plaintiff, in his responsive submission, disputes this fact and cites for the Court his deposition testimony at page 97. However, as is the case most of the time when the plaintiff disputes the defendant's proposed undisputed facts, the cited evidence flatly supports the defendant's characterization of the evidence and wholly contravenes the plaintiff's characterization. At page 57 of the plaintiff's deposition, the following discourse takes place:

Q. (By Mr. Mitchell) I believe it was in August of 1996 when the company wanted to take a video of you operating the saw?

A. Yes, sir.

Q. Do you remember refusing to allow that to be done?

A. Yes, sir.

Despite this unambiguous testimony, the plaintiff disputes the defendant's characterization that the plaintiff initially agreed to be videotaped and when the videographer arrived on August 22, 1996, plaintiff refused to cooperate. *See Defendant's Initial Submission in Response to Exhibit D of the Court's Order*, fact no. 36. Given this example of the plaintiff's approach to resolving issues regarding what facts are and are not disputed, one might reasonably question whether plaintiff's counsel appreciates his duty of complete candor to the court. The court has fashioned a comprehensive summary judgment procedure that, among other things, requires counsel to identify disputed facts by specific reference to the evidentiary record. Whether that procedure works as intended depends upon counsel's understanding of and adherence to his duty to the law and to the court. *See Exhibit D to the Court's Initial Order* (entered on July 28, 1997).

[9]Again, as indicated *supra*, the plaintiff cites the plaintiff's deposition testimony in an attempt to refute the defendant's factual characterization here. However, not only does the plaintiff's cited authority not support his position, one of the pages (page 37) the plaintiff relies upon was not submitted as evidence to the Court. *See Opponent's (Plaintiff's) Responsive Submission in Response to Exhibit D of the Court's Order*, at 3 (fact no. 39) & *Plaintiff's Evidentiary Submissions in Response to Exhibit D of the Court's Order* ("Excerpts from the Deposition of Swartz").

7

On September 4, 1996,[10] plaintiff again visited Dr. Givhan.  Dr. Givhan had viewed the videotape of the sawyer at work and had concluded that plaintiff was not prohibited from performing the sawyer job and that plaintiff's prior restriction on repetitive neck motion was to be removed, leaving only the 40-hour work week restriction.

On September 5, 1996, plaintiff returned to the mill and worked as a sawyer for the remainder of that week, the entire next week, and the first two days of the following week. Shortly after arriving at work on Wednesday, September 18, plaintiff left the sawyer cab, approached Mr. Conley and, with no advance notice, told Mr. Conley that he was leaving for a doctor's appointment.  In accordance with GSPC policy, plaintiff subsequently was suspended for one (1) day for failing to obtain advance approval to leave work early.

Plaintiff was seen by Dr. Brad A. Ward for the first time on September 18, 1996. When plaintiff returned on Friday, September 20, 1996, he brought a note from Dr. Ward which, like the original note from Dr. Givhan, stated that plaintiff should avoid repetitive neck movements.  Based on Dr. Ward's note, plaintiff returned to work and revived his earlier contention that he was unable to perform the sawyer's job.  Notwithstanding the restrictions that he had imposed on the plaintiff, Dr. Ward never stated that the plaintiff was unable to perform the job of sawyer.

When plaintiff returned to work on September 20, 1996, Mr. Hinson and Mr. Conley advised the plaintiff that he could tie bundles of lumber for that day only but that because this was not an actual job, plaintiff would be expected to return to his sawyer job the next

---

[10]The plaintiff disputes the date of this doctor visit but cites no evidence controverting the defendant's characterization of this fact.

8

work day. Tying bundles of lumber is not a regular, full-time job at GSPC. Mr. Conley and Mr. Hinson further informed the plaintiff that he should not return unless he was willing to perform the sawyer job. Plaintiff worked the remainder of that day and did not report to work at the Jug Factory Road mill again.[11]

On September 25, 1996, plaintiff Swartz filed a Charge of Discrimination with the EEOC, alleging discrimination on the basis of disability, in violation of the ADA, and on the basis of age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623, *et seq.* In his EEOC Charge, plaintiff asserted that he was unable to perform the sawyer job.

On October 24, 1996, a physical work performance evaluation was performed on the plaintiff. *Plaintiff's Exhibit 1 to Tucker Deposition.* The plaintiff was recorded as fully participating in 21 out of 21 tasks performed in the evaluation. *See id.* The results of the October 24, 1996, evaluation indicate that the plaintiff was "incapable of sustaining the sedentary level of work for an 8-hour day." *Id.* The evaluation also found that the plaintiff was incapable of sitting or standing for more than one-third of the day, completely incapable of performing work in a bent-over sitting position, incapable of repetitive trunk rotating sitting, and incapable of work in the sitting position. *See id.* In all categories where the evaluation measured patient participation, the plaintiff reached safe maximal effort or wanted to continue the task even though signs of unsafe maximal effort were observed by the evaluator. *See id.*

---

[11]Apparently, plaintiff Swartz did not work from September 1996 through May of 1997. *Plaintiff's Deposition,* at 46.

9

In December 1996, Tim Tucker, director of human resources at GSPC, contacted the plaintiff and invited him to a meeting wherein job openings at the new mill in Moundville were discussed, and plaintiff was given the opportunity to bid on a new job. At that meeting, Mr. Hinson approached plaintiff and advised him that his sawyer job was still available whenever he wanted to return. On March 4, 1997, the EEOC dismissed the plaintiff's EEOC Charge, concluding that the information provided by the plaintiff failed to establish a violation of either statute.

Plaintiff did, in fact, bid on at least two jobs[12] and, in May 1997, was recalled by GSPC to work at the new mill as a sharp-chain operator. Plaintiff testified that the sharp-chain operator is the best job he has ever had and that he has no physical problems performing it.[13] On June 2, 1997, plaintiff filed his civil complaint in this action, re-alleging his ADA claim, namely, that GSPC had failed to provide him with a reasonable accommodation at the mill in Tuscaloosa and that GSPC had subjected him to a hostile environment based upon his alleged disability.[14]

As evidence of a hostile environment, the plaintiff testified that Mr. Hinson advised him that with Dr. Givhan removing his physical restrictions, he (Hinson) would be returning plaintiff to the sawyer job and that if plaintiff could not perform the job, then he had to go home. Plaintiff also avers that another employee was reasonably accommodated by

---

[12]Plaintiff testified that he applied for the positions of saw filer helper and sharp-chain operator, respectively. *Plaintiff's Deposition*, at 86.

[13]The plaintiff testified that "it was the best job I've ever had in my life. It was so easy to run. My daughter could run it with some training." *Plaintiff's Deposition*, at 50-51.

[14]In his civil complaint, plaintiff Swartz did not re-allege his ADEA claim, which was originally made in his EEOC Charge.

10

allowing him to perform routine chores for several weeks while recuperating from a broken arm. It is undisputed, however, that no such full-time, "light-duty" jobs exist at Log Industries. Plaintiff further avers that GSPC could have trained him to scale logs or grade lumber. Plaintiff Swartz testified that he is not aware of any openings that existed for such jobs.

Although plaintiff testified that he thought GSPC should have considered installing an additional video monitor in the sawyer's cab to possibly reduce the amount of neck movement required, plaintiff never spoke to a GSPC official about this idea.[15] Plaintiff admits that at no time after Dr. Givhan removed his restrictions did he ever speak with anybody at the mill about ways in which he believed that he could be accommodated in the sawyer job.[16] Moreover, plaintiff never approached any supervisor, manager, or other GSPC official asserting that he believed he was disabled and/or that he required an accommodation under the ADA.[17]

---

[15] Again, the plaintiff also disputes this fact, but cites evidence that does not support his disagreement. Indeed the evidence cited by the plaintiff wholly supports the defendant's factual proposition:

> Q. Can you name any company official that you talked with about adding some kind of a monitor in the saw cab?
>
> A. No, sir.

*Plaintiff's Deposition*, at 63.

[16] The plaintiff disputes this fact and cites his deposition testimony at pages 62-64, 81-83, 104-05, 115-16, and 125, in support. However, none of the cited evidence rebuts the defendant's characterization of this fact. The Court notes, however, that, although the plaintiff cites these pages, pages 63, 82, and 105, are notably absent from the evidence he submitted to the Court.

[17] The plaintiff disputes this fact, citing pages 62-64, 81-83, 104-05, 115-16, and 125, as support for his dispute. However, these pages in no way controvert the defendant's assertion. Therefore, the court will deem the fact to be admitted for purposes of the motion for summary judgment.

Plaintiff admits that, other than possibly through the installation of a video monitor in the sawyer's cab, there existed no other means to modify the sawyer's job to reasonably accommodate what he believed were his physical restrictions.  Plaintiff testified that, as a result of his back condition, he is no longer able to run, swim or lift weights recreationally, "to bike as efficiently as [he] would love," or to perform "hard manual work anymore that [he] would like to do."  Mr. Tucker testified that he did not believe that the plaintiff had a disability under the ADA, but rather that the plaintiff merely had some temporary restrictions as a result of on-the-job injuries.

**III.    Summary Judgment Standard.**

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party

12

support its motion with affidavits or other similar materials *negating* the opponent's claim."
*Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id.* at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

13

must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11(1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III. Discussion.

### A. Failure-to-Accommodate Claim.

Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). To state a prima facie case of disability

14

discrimination, a plaintiff must show (1) that he has a disability; (2) that, with or without reasonable accommodations, he can perform the essential functions of the position he holds; and (3) that he was discriminated against because of his disability. *See Terrell v. USAir*, 132 F.3d 621, 624 (11th Cir. 1998); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278 (11th Cir. 1997); 42 U.S.C. § 12111(8) (defining "qualified individual" the same as factor (2) above). Importantly, "the burden of identifying an accommodation that would allow a qualified individual to perform the job rests with that individual, as does the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable." *Stewart*, 117 F.3d at 1286; *see also Willis v. Conopco, Inc.*, 108 F.3d 282, 284-86 (11th Cir. 1997). Once the plaintiff has met his burden of proving that reasonable accommodations exist, the defendant-employer may present evidence that the plaintiff's requested accommodation imposes an undue hardship on the employer. *See Willis*, 108 F.3d at 286.

Defendant GSPC avers that: (1) plaintiff is not disabled for purposes of the ADA; (2) plaintiff is not a "qualified individual with a disability" and is therefore not protected by the ADA; (3) Plaintiff never requested and therefore defendant was under no obligation to provide an accommodation; and (4) the defendant reasonably accommodated the plaintiff. *See Defendant's Initial Submission in Response to Exhibit D of the Court's Order*, at 13-23.

1.    **Is Plaintiff "Disabled" Under the ADA?**

a.    **Does Plaintiff Have a Physical Impairment that Substantially Limits a Major Life Activity?**

Under the terms of the ADA, one is considered to have a disability if he or she:  (1) has a physical or mental impairment which substantially limits one or more of that person's major life activities, (2) has a record of such impairment, or (3) is regarded as having such an impairment. *See* 42 U.S.C. § 12102(2).  While the ADA does not define the key terms, guidance is found in the definitions listed in the regulations for the Rehabilitation Act, which have been adopted by the Equal Employment Opportunity Commission with regard to the ADA.   The regulations define physical or mental impairment as including: (1) any physiological disorder or condition affecting one or more of several body systems, or (2) any mental or psychological disorder. *See* 29 C.F.R. Pt. 1630, App. § 1630.2(h).  An impairment rises to the level of a disability when it substantially limits one or more of the individual's major life activities. *See* 29 C.F.R. Pt. 1630, App. § 1630.2(j).

Major life activities are those basic activities that the average person in the general population can perform with little or no difficulty. *See* 29 C.F.R. Pt. 1630, App. § 1630.2(i). They may include caring for oneself, performing manual tasks, walking, working, sitting, standing and lifting. *See id.*  A person is substantially limited in these activities if, as compared to an average person in the general population, he is significantly restricted as to the condition, manner or duration under which he can perform a major life activity. *See* 29 C.F.R. § 1630.2(j).

Moreover, the Code of Federal Regulations suggests that: "If an individual is not substantially limited with respect to any other major life activity, the individual's ability to perform the major life activity of working should be considered. If an individual is substantially limited in any other major life activity, no determination should be made as to whether the individual is substantially limited in working." 29 C.F.R. Pt. 1630, App. § 1630.2(j).

Whatever the impact on one's ability to work, the ability to care for oneself, perform manual tasks, walk, sit, stand, lift, and reach are all described as major life activities. *See* 29 C.F.R. Pt. 1630, App. § 1630.2(i). On October 24, 1996, a physical work performance evaluation was performed on the plaintiff. *Plaintiff's Exhibit 1 to Tucker Deposition*. The plaintiff was recorded as fully participating in 21 out of 21 tasks performed in the evaluation. *See id.* However, the results of the October 24, 1996, evaluation indicate that the plaintiff was "incapable of sustaining the sedentary level of work for an 8-hour day." *Id.* The evaluation also found that the plaintiff was incapable of sitting or standing for more than one-third of the day, completely incapable of performing work in a bent-over sitting position, incapable of repetitive trunk rotating sitting, and incapable of work in the sitting position. *See id.* In all categories where the evaluation measured patient participation, the plaintiff reached safe maximal effort or wanted to continue the task even though signs of unsafe maximal effort were observed by the evaluator. *See id.* Moreover, the plaintiff testified that, as a result of his back condition, he is no longer able to run, swim or lift weights recreationally, "to bike as efficiently as [he] would love," or to perform "hard manual work anymore that [he] would like to do." *Plaintiff's Deposition*, at 133-34.

17

The plaintiff contends that the restrictions on repetitive neck movements implemented by Dr. Ward substantially limited him from performing as a sawyer, thus further evidencing a disability. The defendant points out that Dr. Givhan, the doctor who performed plaintiff's surgery and the only physician who has witnessed the sawyer job being performed, has concluded not only that there is no medical reason why plaintiff could not perform the sawyer job, but also specifically stated that the type of repetitive neck motions plaintiff should avoid is not the type encountered in the sawyer job. *See Defendant's Initial Submission in Response to Exhibit D of the Court's Order*, at 15-16. Indeed, the plaintiff concedes that Dr. Ward never informed him that he could not perform the sawyer job, even after he re-imposed plaintiff's limitation on repetitive neck motion. *Plaintiff's Deposition*, at 96-97.

Notwithstanding the defendant's characterization on this point, the plaintiff's sworn testimony, together with the physical work performance evaluation on October 24, 1996, and Dr. Ward's assessment constitute evidence, and create a genuine issue of material fact, that plaintiff was substantially limited in his ability to sit and stand while working, which are major life activities set out by the regulations. A literal application of the regulation thus indicates that plaintiff must show only that he is substantially limited in a major life activity, such as sitting or standing, notwithstanding the arguable absence of a substantial limitation on his ability to work.

Defendant argues, however, that even assuming plaintiff were unable to perform the job of sawyer, he does not have a "disability" that substantially limits his work opportunities for other kinds of jobs. Citing case authority, defendant notes that an impairment that

18

prevents an employee from performing only one kind of job is not a disability under the Act and quotes from a Fourth Circuit opinion: "[W]hen the major life activity at issue is working, the 'inability to perform a single, particular job does not constitute a substantial limitation.'" *Williams v. Channel Master Satellite Sys.*, 101 F.3d 346, 349 (4ᵗʰ Cir. 1996) (*quoting* 29 C.F.R. § 1630.2(j)(3)); *see also Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11ᵗʰ Cir. 1997). The defendant argues that, because plaintiff has not identified any job other than that of sawyer at the Jug Factory Road mill that he claims he was unable to perform, plaintiff cannot now argue that he is "disabled" within the meaning of the ADA. *See Defendant's Initial Submission in Response to Exhibit D of the Court's Order*, at 16.

As noted above, however, the plaintiff has presented evidence that he is limited in his ability to sit and stand. Those are major life activities.

### 2. Is Plaintiff a "Qualified Individual with a Disability?"

In addition to creating a genuine issue of material fact on the question of his disability, the plaintiff, to avoid summary judgment, must also do so on the issue of whether he is qualified for the position that he held or desired. *See* 42 U.S.C. § 12112(a). To be considered a qualified individual, plaintiff must be able to perform the essential functions of his position, with or without reasonable accommodation. *See* 42 U.S.C. § 12111(8).

A reasonable accommodation should impose no undue hardship on the employer. Moreover, an employer is only required to make a reasonable accommodation when such accommodation will enable the employee to perform the essential functions of the job. If the employee is still unable to perform the essential functions of the position, the employer

is under no obligation to eliminate or reallocate any of the job's essential functions. *See Larkins v. CIBA Vision Corp.*, 858 F. Supp. 1572, 1583 (N.D. Ga. 1994) (*quoting Bolton v. Scrivner, Inc.*, 836 F. Supp. 783, 788-89 n.4 (W.D. Okl. 1993) ("The ADA does not require employers to modify the actual duties of a job in order to make an accommodation for individuals who are not physically capable of performing them . . . . The statute still requires that an individual be able to 'perform the essential functions of the employment position . . .'").

### a.   Is Plaintiff Able to Perform the Essential Functions of the Sawyer's Job?

As to the sawyer's job, the plaintiff contends that he is a "qualified individual" under the ADA because he performed the job for seventeen (17) years, *Opponent's (Plaintiff's) Responsive Submission in Response to Exhibit D of the Court's Order*, at 8; and because he could do the job with accommodations. *Id.* (citing *Plaintiff's Deposition*, at 115). The defendant, on the other hand, asserts that the plaintiff, by his own admissions, is not a qualified individual under the ADA. *See Defendant's Initial Submission in Response to Exhibit D of the Court's Order*, at 21-22. Specifically, the defendant argues that although his physician disagreed with him, plaintiff nonetheless claims that he is permanently and totally disabled. *See id.* (citing *Exhibit 11 to Tucker Affidavit*). The defendant contends primarily that a person cannot be a "qualified individual with a disability" if he has

represented that he is unable to perform the essential functions of his job in order to obtain disability benefits.[18] *See id.* (citing numerous district court opinions for the proposition).

However, the Eleventh Circuit recently held in *Talavera v. School Board of Palm Beach County*, 129 F.3d 1214 (11th Cir. 1997), that an employee's certification that he is totally disabled for purposes of obtaining disability benefits does not judicially estop the employee from arguing that he is a qualified individual with a disability under the ADA. *See Talavera*, 129 F.3d at 1220.[19]   While this Court views the *Talavera* holding with a jaundiced eye, *Talavera* is nonetheless dispositive of the defendant's *per se* estoppel argument.

The record reflects that the plaintiff has not unequivocally asserted that he is able to perform the essential functions of the sawyer job, with or without accommodation.  In fact, the only accommodation which the plaintiff has identified that he believes "maybe" or "probably" would have enabled him to perform the sawyer job was the installation of an additional video monitor in the sawyer's cab.  *Plaintiff's Deposition*, at 115-16.  That notwithstanding, in his brief to the Court, plaintiff lists as an undisputed fact that he *was* capable of performing the job of sawyer.  *See Plaintiff's Undisputed Facts Nos. 163 & 186*.

---

[18]The defendant argues that "[b]ecause plaintiff made it clear to both his doctor and the Company that he was seeking permanent and total disability, that he could not perform his job as a sawyer and, in fact, stated under penalty of perjury in his EEOC Charge that he is incapable of doing so, he is not a qualified individual with a disability and the Company did not have to accommodate him." *See Defendant's Initial Submission in Response to Exhibit D of the Court's Order*, at 21-22.

[19]The *Talavera* court was careful, however, to note that an ADA plaintiff *is* barred from denying the truth of any statements made in his disability application, reasoning that an ADA plaintiff should not be permitted to disavow any statements made in order to obtain the disability benefits. *See Talavera*, 129 F.3d at 1220. The Court notes that the plaintiff has stated in his sworn affidavit that he has "never filed for Social Security disability benefits or long term disability benefits or insurance disability benefits." *Affidavit of William C. Swartz*, ¶2.

The plaintiff cannot have his cake and eat it, too, however. The plaintiff is either a qualified individual with a disability, able to perform the sawyer's job with or without accommodation, or he is not.

As a result of the plaintiff's contradictory factual averments concerning his ability to perform the sawyer's job, the Court will assume for summary judgment purposes that he is a "qualified individual" under the ADA. However, because the Court concludes that defendant GSPC reasonably accommodated the plaintiff's disability, the defendant's motion for summary judgment will be granted. Important to the Court's determination is the plaintiff's admission that he never suggested his self-styled accommodation (installation of a video monitor in the sawyer's cab) to a GSPC official and his testimony that the one person with whom he may have discussed the idea–another sawyer–informed him that he did not think that the monitor would make any difference. *See id.*, at 62-63.

It is axiomatic that the burden of identifying the accommodation that would allow a qualified individual to perform the job rests with that individual, as does the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable. *See Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997); *Willis v. Conopco*, 108 F.3d 282, 283 (11th Cir. 1997); *see also* 29 C.F.R. § 1630.9, App. (1995) ("In general . . . it is the responsibility of the individual with the disability to inform the employer that an accommodation is needed.").

Moreover--and perhaps most important to the analysis--the Court is convinced that defendant GSPC provided plaintiff with several, sufficient accommodations to enable him to perform the job of sawyer. When Dr. Givhan originally restricted plaintiff from repetitive

neck motions, GSPC modified the chair in the sawyer cab so as to limit the amount of neck motion required. Furthermore, the plaintiff was given frequent rest breaks, with virtually no limit on their length. In addition, plaintiff's working hours were reduced to conform with the doctor's limitation to an 8-hour day, 40-hour workweek.

To attempt to create a genuine issue of material fact, the plaintiff relies primarily upon a single return-to-work slip provided by Dr. Ward, a physician who never treated plaintiff, never observed the sawyer job, and briefly met with the plaintiff only once after the plaintiff apparently became dissatisfied with Dr. Givhan's conclusions. Even then, Dr. Ward never advised plaintiff that he could not perform the sawyer job; plaintiff made this determination on his own. *Plaintiff's Deposition*, at 96-97. On the other hand, Dr. Givhan–plaintiff's primary treating physician and the physician who performed plaintiff's neck surgery–determined that plaintiff *could* perform the sawyer job, especially after the modifications to the chair in the sawyer's cab were accomplished.

Finally, GSPC provided plaintiff with a new job when the new mill in Moundville opened in the Spring of 1997. Having fully and effectively accommodated the plaintiff in his regular job as a sawyer, GSPC more than satisfied any obligations it may have had under the ADA and, as a result, these undisputed facts demonstrate that GSPC reasonably accommodated plaintiff.

In a last ditch effort to derail the defendant's motion, the plaintiff, citing *Beck v. University of Wisconsin Board of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996), argues that the employer "has at least some responsibility for participating in the interactive process with the employee to determine a possible accommodation," apparently referring to the video

monitor accommodation scheme contrived by the plaintiff. *Opponent's (Plaintiff's)*
*Responsive Submission in Response to Exhibit D of the Court's Order*, at 18 (citing *Beck*,
75 F.3d at 1135). The plaintiff's reliance on *Beck*'s "interactive process" duty is misplaced,
however.

As the defendant correctly points out in its brief, the Eleventh Circuit has stated
unequivocally:

> To the extent that the Seventh Circuit's *Beck* opinion can be
> interpreted (as Plaintiff says) to require an "interactive
> process," such that an employer can be held liable merely for
> failing to engage in the process itself (regardless of whether a
> "reasonable accommodation" could in reality have been made
> for the employee), *Moses [v. American Nonwovens, Inc.*, 97
> F.3d 446, 448 (11th Cir. 1996)], holds otherwise. And, to the
> extent that *Beck* can be interpreted as requiring that the
> "interactive process" envisioned in the regulations carry over
> to a plaintiff's burden of production in court (thus, relieving the
> plaintiff-employee of her "burden of producing evidence that
> reasonable accommodations were available"), *Moses* holds
> otherwise.

*Willis v. Conopco*, 108 F.3d 282, 285 (11th Cir. 1997); *see also Stewart v. Happy Herman's
Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997) (stating that "the burden of
identifying an accommodation that would allow a qualified individual to perform the job
rests with that individual, as does the ultimate burden of persuasion with respect to
demonstrating that such an accommodation is reasonable").

As explained *supra*, plaintiff has testified that he mentioned to only a fellow
employee that video monitors *might* assist him in performing the sawyer's job. *See
Plaintiff's Deposition*, 62-63. The plaintiff further admits that he never mentioned his idea
to any manager or other Company official. *See id.* Moreover, he admits that even after he

provided GSPC with the restrictions imposed by Dr. Ward (on whom plaintiff relied at the time to establish that he could not perform the sawyer's job), he never discussed reasonable accommodations pertaining to the sawyer job with *anyone* at the mill:

> Q: . . . My question is, at the time you took this document [the Return-to-Work slip from Dr. Ward] or at any time after that between September 3rd [1996] and May [1997], before Tim called you about going back to the new mill, did you talk with anybody at the mill about what could be done to the sawyer position so that you could do it within the restrictions [in Dr. Ward's Return-to-Work slip]?
>
> A: No.

*Plaintiff's Deposition*, at 124.

The only other accommodations plaintiff suggests are that he should have been placed on light duty or that he could have been given a different job. However, the plaintiff never mentioned these alternatives until his pretrial deposition. In addition, plaintiff has failed to rebut the defendant's consistent assertion that no other jobs were available. Further, plaintiff emphasizes throughout his opposition brief that his physical restrictions are permanent, but then asserts that GSPC could have reasonably accommodated him with a light-duty job and notes that another employee was allowed to work a light-duty assignment while he was recovering from a broken arm. *See, e.g., Opponent's (Plaintiff's) Responsive Submission in Response to Exhibit D of the Court's Order*, at 12, 22-23; *Plaintiff's Deposition*, at 102-03.

Without question, providing a *temporary*, light-duty *assignment* is not the equivalent of providing a *full-time*, light-duty *job*. Moreover, no such light-duty jobs existed at the mill. *See Tucker Deposition*, at 188-89; *cf. Cheatwood v. Roanoke Indus.*, 891 F. Supp. 1528,

1539 (N.D. Ala. 1995) ("Plaintiff also argues that defendant offered another employee light duty work with restrictions on lifting. However, 'the fact that certain accommodations may have been offered by the [defendant] to some employees as a matter of good faith does not mean that they must be extended to [plaintiff] as a matter of law.'") (quoting *Myers v. Hose*, 50 F.3d 278, 284 (4th Cir. 1995)). Employers are only required to provide "alternative employment opportunities reasonably available under the employer's existing policies." *Terrell v. USAir*, 132 F.3d 621, 627 (11th Cir. 1998) (citation and internal quotations omitted).

Plaintiff appears to rely principally on the fact that GSPC was *aware* that he had some physical limitations, as well as his alleged inquiry as to whether there was "anything" he could do at GSPC, to establish that he requested a specific accommodation. *See Opponent's (Plaintiff's) Responsive Submission in Response to Exhibit D of the Court's Order*, at 20 (citing *Plaintiff's Deposition*, at 123). As the defendant properly points out, such an "abstract" accommodation request/"flexible, interactive process" argument is one that the Eleventh Circuit specifically rejected in *Willis v. Conopco, Inc.*, 108 F.3d 282, 284-86 (11th Cir. 1997). *See supra*. Plaintiff's burden is to produce evidence that a specific, reasonable accommodation that would have enabled him to perform the job of sawyer was available at the time of the employer's alleged adverse action and that this accommodation was identified to the employer.[20] Because the plaintiff has failed to meet his burden, the

---

[20]As one court in this district has explained:

> Plaintiff maintains that defendant's failure to initiate colloquy in order to identify reasonable accommodations operates as a per se preclusion to summary judgment. Plaintiff's argument is misplaced. *The burden is on the employee to inform the employer that an accommodation is needed and to request a specific accommodation.*

*Cheatwood v. Roanoke Indus.*, 891 F. Supp. 1528, 1538 (N.D. Ala. 1995) (Hancock, J.) (emphasis added).

failure to accommodate claims fail in this alternative respect, notwithstanding the Court's ultimate conclusion that GSPC reasonably accommodated the plaintiff anyway.

**B.    ADA Hostile Work Environment Claim.**

Disability-based hostile environment claims are analyzed under the Title VII standards for gender-based hostile environment claims. *See, e.g., Rio v. Runyon*, 972 F. Supp. 1446, 1459 (S.D. Fla. 1997). Title VII is violated when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S. Ct. 2399, 2405, 91 L. Ed. 2d 49 (1986). To establish a hostile environment claim based on disability, an employee must prove: (1) that he belongs to a protected group; (2) that he was subjected to unwelcome harassment; (3) that the harassment complained of was based upon his disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt, remedial action. *See Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982) (applying factors to hostile environment claim based on sexual harassment).

To satisfy the fourth element, plaintiff must prove that the harassment was "sufficiently severe or pervasive," *Meritor*, 477 U.S. at 67, and that the harassment objectively--not subjectively--created a hostile environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993) (holding that a defendant's conduct must be severe or pervasive enough to create a work environment a reasonable person

would find hostile or abusive). In determining whether the defendant created a hostile work environment, the court must consider the frequency and severity of the alleged conduct, whether the conduct was threatening or humiliating, and whether the conduct unreasonably interfered with the plaintiff's work performance. *See Edwards v. Wallace Community College*, 49 F.3d 1517, 1521-22 (11th Cir. 1995).

The plaintiff contends that he was subjected to a hostile work environment on the basis of his disability, *see Complaint*, ¶8, and for evidence relies on the fact that GSPC allegedly refused to reasonably accommodate him. Remarkably, however, plaintiff does not identify a single incident where he was treated in a hostile or abusive manner based upon a disability or for any other reason. *See Opponent's (Plaintiff's) Responsive Submission in Response to Exhibit D of the Court's Order*, at 24-25.

Plaintiff testified that Mr. Hinson advised him that, with Dr. Givhan removing his physical restrictions, he (Hinson) would be returning plaintiff to the sawyer job and that if plaintiff could not perform the job, that plaintiff would have to go home. *See Plaintiff's Deposition*, at 52-53; 63-64. It appears, in other words, that the plaintiff here is attempting to establish a hostile environment by the simple fact that his supervisor told him that if he could not perform his job, he should go home. Assuming the plaintiff's testimony here is true, as the Court should at this stage, plaintiff has failed to state a hostile environment claim under the ADA.

As Judge Posner has aptly written, the law distinguishes between non-actionable behavior and true hostile environment harassment: "The concept of . . . harassment is designed to protect working [individuals] from the kind of . . . attention that can make the

workplace hellish. . . . It is not designed to purge the workplace of vulgarity." *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995).  Here, the plaintiff's allegations do not even rise to the level of objective "vulgarity," much less to a level making the workplace "hellish." This claim is frivolous at best and malicious at worst.

## IV.    Conclusion.

Accordingly, the defendant's motion for summary judgment will be granted in all respects. The Court will enter an appropriate order in conformity with this opinion.

Done, this ____8+h____ of April, 1998.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE